Filed 6/4/13  P. v. Shammam CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061462 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE286668) |
| FRANSWA SHAMMAM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Charles M. Sevilla for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

Franswa Shammam appeals a judgment entered following his jury conviction of first degree murder (Pen. Code, § 187, subd. (a)).[1]  Although the murder was committed

---

[1]    All statutory references are to the Penal Code.

in 1994, Shammam was not charged with murder until 2008. On appeal, he contends the trial court erred by: (1) denying his motion to dismiss the case because the 14-year pre-accusation delay denied him his state and federal constitutional rights to due process; (2) instructing with CALCRIM No. 362 on consciousness of guilt; and (3) not granting him an alternative remedy to dismissal of the case.

FACTUAL AND PROCEDURAL BACKGROUND

*Procedural background.* On September 16, 1994, David Binno died after being shot twice in the head. In December 2008, a felony complaint was filed charging Shammam with the first degree murder of Binno (§ 187, subd. (a)) and alleging he personally used a firearm in committing that offense (§ 12022.5, subd. (a)). In April 2009, an information was filed charging him with the same offense and allegation.

Before trial, Shammam filed a motion to dismiss the case for pre-accusation delay or, alternatively, for exclusion of testimony by certain witnesses. The prosecution opposed the motion. Following an evidentiary hearing, the trial court denied the motion to dismiss for pre-accusation delay. The court balanced the prejudice Shammam showed (i.e., fading memories of witnesses) against the prosecution's justification for the delay (i.e., continuing investigation) and concluded his constitutional rights to due process had not been denied as a result of the 14-year pre-accusation delay.

After the first trial, the jury could not reach a verdict and a mistrial was declared. Before the second trial, Shammam filed another motion to dismiss the case for pre-accusation delay, which the prosecution opposed and the trial court denied. At the second trial, the jury found Shammam guilty of first degree murder and found true the

2

firearm allegation. Shammam then filed another motion to dismiss the case for pre-accusation delay, which the prosecution opposed and the trial court denied. The court sentenced Shammam to 25 years to life in prison for first degree murder and a consecutive four-year term for the firearm allegation. Shammam timely filed a notice of appeal.

*Factual background.* In 1994, Binno lived with his girlfriend, Brenda Konja Stine (Brenda) in an upstairs apartment in an apartment complex on Sweetwater Springs Boulevard. Binno and Shammam had been close friends for about two years. In the spring of 1994, Shammam became friends with Jeremy Allen Wessels and began spending more time with Wessels and less with Binno. Binno and Wessels did not like each other.

At about 1:00 or 2:00 p.m. on September 16, 1994, Binno went to the home of his friend, Haitham Marcos, to help him with his car. Binno drove a black Volkswagen sedan and wore a gold bracelet and gold necklace.[2] At about 3:30 p.m., Binno appeared a little alarmed because he was late for a meeting at his apartment with a customer of his (Binno's) cell phone and pager business.[3] Binno also told Marcos that Wessels was going to stop by his apartment and pay him money for a bill he owed. Binno left Marcos's house about five to 10 minutes later.

---

[2] After Binno's brother, Steve, passed away, Binno received the gold jewelry. The gold bracelet had diamonds that spelled out either Binno or Steve's first name.

[3] At sometime before 3:00 p.m., Brenda called Binno before she began work at a restaurant on a 3:00 p.m. to 11:00 p.m. shift.

At about 4:00 p.m., Kristin Lybarger, a resident of Binno's apartment complex, returned home and saw a small black Nissan truck with a camper shell parked in the spot assigned to Binno. She believed the camper shell was also black. At 4:09 p.m., Binno apparently was home and made a phone call responding to an advertisement for a car for sale. Because the car's seller did not pick up that call, Binno hung up without leaving a message on the seller's answering machine. Between 4:15 and 4:30 p.m., Kara Walter, who lived in the apartment below Binno's, heard two or three people talking as they walked upstairs to Binno's apartment. A few minutes later, the music in Binno's apartment was turned up excessively loud. Walter did not think much about the loud music because it was a chronic problem. Shortly after 4:30 p.m., Walter heard two pops that sounded like firecrackers coming from Binno's apartment. She then heard voices talking. Not thinking much of it, Walter left her apartment and went to her mother's house.

At about 4:40 p.m., Lybarger left her apartment to go to a gym class. As she walked to her car, she saw Binno's black Volkswagen parked in its proper spot and the black truck with the camper shell parked directly to its right.

During the early evening, David Abdala was attending a Friday night football game at Valhalla High School when Shammam called or paged him and arranged to pick him up at the game. Abdala left the stands and met Shammam in his (Shammam's) black or dark blue Nissan truck in the parking lot. Abdala testified that Shammam's Nissan truck had a red shell on it. Shammam's girlfriend, Monica Bihouet, was with him in the

4

truck. Abdala got in the truck and they drove away.[4] As the truck drove out of the parking lot, Shammam told Abdala that "Alan killed David," meaning Wessels had killed Binno. Shammam also told Abdala that if he (Abdala) ever told anybody, Shammam would kill Abdala and his family. Abdala did not respond and remained quiet. Shammam drove to his cousin Ryan's house, parked the truck, walked to the back of the truck, and grabbed a case from the back. The case was about 18 inches long by four inches wide. Ryan came out to meet Shammam, who handed Ryan the case. While Shammam was outside the truck, Abdala asked Bihouet in Spanish if it were true. She nodded her head affirmatively. She looked pale and scared. Shammam got back in the truck, drove to Abdala's home, and dropped him off. Abdala did not tell law enforcement officers about Shammam's statements until after Shammam's arrest in 2008 because he believed Shammam's threat and was afraid of him and Wessels.

At about 8:30 p.m., Walter returned to her apartment and heard very loud music still emanating from Binno's apartment. She called the apartment manager to complain. When there was no response to knocking on Binno's door, a security guard entered the apartment and saw Binno lying on the floor and some blood. Firefighters responded to the guard's call for assistance. They turned on the apartment's lights and turned down the music. They saw Binno lying down against a wall in a small dining area near the kitchen. They saw significant blood loss and brain matter on the floor.

---

4    By the time of Shammam's trial, Bihouet had married and changed her last name to Cervantes. To avoid confusion, we will refer to her by her maiden name, Bihouet.

At 10:08 p.m., a deputy sheriff arrived. From downstairs, she reported hearing loud music emanating from Binno's apartment. Inside the apartment, the television was turned on and music was blaring. Binno was lying on the floor facedown with two gunshot holes in the back of his head. Rigor mortis had set in his body. There was blood spattered on the wall and around Binno's head and face. Two shell casings were found on the floor. One gunshot wound was near the top of his head. The gun was fired close to Binno's head and the bullet travelled down to the base of his skull. The second gunshot wound was to the back of his head. The gun was held a few inches from his head. The bullet came from the side, moving from left to right and downward. Each wound would have killed Binno. An autopsy performed on September 18, 1994, showed Binno's stomach contained undigested rice. Because healthy persons usually empty their stomachs in a couple of hours, the forensic pathologist believed it was "more probable than not that [Binno] had eaten within two hours of death."

A crime scene reconstructionist concluded Binno's head was on or near the floor when he received both shots to the head. At the time of his death, Binno's left arm was underneath his body cross-wise with his left hand emerging from under his right hip, which position appeared to be the result of being restrained in a wrestling, judo, or hand-to-hand combat type of control hold. Binno had no defensive wounds and there were no signs of a struggle. It appeared Binno was taken by surprise or skill to the floor with little or no resistance. He was shot on the floor where he was taken down.

Although Binno had $52 in his left front pocket, he did not have his cell phone or pager on him and his gold bracelet and necklace were missing. There was no evidence of

6

a break-in and his apartment was not ransacked. Binno's cell phone was missing from the apartment. After his death, his cell phone was used three times--twice for outgoing calls and once for an incoming call. One call was on September 24, 1994.

A deputy sheriff picked up Brenda at the restaurant. She was informed of Binno's death and taken to the parking lot of their apartment complex at about 2:00 a.m. She identified her black Volkswagen in the parking lot. At a detective's request, Brenda called Shammam in the early morning hours. Shammam told her that he could not come there right away because he was coming home from Disneyland. Shammam eventually arrived there and, as Binno's body was being removed from the apartment, consoled Brenda.

At 10:15 a.m. on September 17, 1994, San Diego County Sheriff's Detective Dan Jopes began an interview of Shammam at the Lemon Grove sheriff's station. A tape recording of that interview was played for the jury. Shammam stated he and Binno had been good friends for about three years. The last time he had seen Binno was at Abdala's home two nights before the interview. Shammam said he first learned of Binno's death when Binno's brother, Joe, called him the previous night while he was sleeping. However, Shammam did not really pay attention to Joe's call because he was not fully awake. Joe called him again in the morning and told him about Binno's death. Shammam admitted to Jopes that he had "kind of" a falling-out with Binno because he "starts trouble" and Shammam's parents did not want him to "hang around" with Binno anymore. Shammam later stated he did not have any trouble with Binno.

7

When asked when his truck was last at Binno's apartment, Shammam replied, "Yesterday," and then gave a description of what he did on September 16, 1994. In the morning, he awoke about 10:00 a.m., drove to Abdala's house or taco shop, and then drove to Pacific Off Roads and bought some lowering blocks for his truck. He stated he then met Wessels at "some girl[']s house," but later said he met Wessels "[a]t this taco shop." Shammam stated he and Wessels went to a Nissan dealership, but later said they first went to eat breakfast at Jimmy's Restaurant at about 11:30 a.m. before going to the Nissan dealership in El Cajon. While they waited two hours for his truck to be repaired, he and Wessels walked to a nearby Honda dealership to look at motorcycles. As they walked back to the Nissan dealership, Wessels told Shammam he (Wessels) had to pay Binno for his cell phone bill. Shammam and Wessels drove to Binno's apartment and Shammam parked his truck two or three stalls away from Binno's car. He denied parking his truck in the first stall next to Binno's or moving his truck after parking it. He and Wessels then walked up to Binno's apartment door and each knocked on the door a number of times. Shammam stated they were at Binno's door "probably about [2:30 p.m.] or somethin' . . . I'm not quite too sure." When no one answered the door, they walked back down to Shammam's truck and drove to a 7-11 store, where Wessels paged Binno a couple of times and left a message on his answering machine. The transcript of the message Wessels left on Binno's answering machine reads: "David this is Alan. Aye we stopped by your house a while ago. But ah, you, I guess you weren't there or something um. We're about to go to the beach right now. So ah, I'll page you tomorrow and ah, I'll get that money to you tomorrow. All right dog. Bye. Talk to you later man."

8

Shammam and Wessels drove to the beach and walked up and down the boardwalk. Shammam then drove to Bihouet's house in Chula Vista and picked her up. After Shammam dropped Wessels off at "some girl[']s house," he and Bihouet drove to Abdala's house and waited with him for someone to pick him (Abdala) up to go to a Valhalla football game. Shammam and Bihouet followed Abdala to the football game and, after the game, dropped Abdala off at his house. Shammam then dropped Bihouet off at her Chula Vista house and drove to his home. He denied talking to Binno at any time on September 16.

Sheriff's detective Frederick Rowe was assigned as the lead investigating detective on the case. Rowe suspected Shammam and Wessels murdered Binno and investigated the case for two and one-half years while he was assigned the case.

In 1996, Bihouet, after breaking up with Shammam, spoke to Brenda (Binno's girlfriend) about his murder. Brenda took Bihouet to speak with Binno's sister, Tanya, who told her to talk with Rowe. On August 27, 1996, Rowe interviewed Bihouet at the sheriff's station and recorded the interview. At Shammam's second trial, Bihouet testified regarding the events of September 16, 1994, and thereafter. Shammam and Wessels came to her door the evening of September 16 when there was "some daylight." At the time, she was living at Yvette Godoy's apartment. Shammam and Wessels were not wearing any shoes and appeared as though they had just showered. As she was standing in the doorway, Shammam told her that they had just killed Binno. Shammam then handed her a heavy bag and told her to hold it for him. They then left and she closed the door. Bihouet looked inside the bag and saw a gold bracelet and chain. The bracelet had

9

the name "Binno" spelled in diamonds on it. Weeks later, Shammam told Bihouet the details about Binno's murder. Bihouet testified:

> "[Shammam] told me him and [Wessels] went to [Binno's] apartment, and they knocked on the door, and he was reading a newspaper at the time when he got there. They started talking. They were joking around for a while, showing some moves, jujitsu moves, or some type of martial arts moves. [¶] Then . . . I believe [Shammam] said that [Wessels] grabbed [Binno] towards his -- like, probably to the back and pulled him down to the floor, and that [Wessels] asked [Shammam] to grab his [Wessels's] gun to shoot him."

Shammam told her that he grabbed Wessels's gun and shot Binno twice in the head. Shammam told her that he turned up the music very loud before he shot Binno. He never told her why he shot Binno.

A couple of weeks after the murder, Shammam asked Bihouet whether she knew anyone who could melt down the gold jewelry. She knew one of her aunt's friends who lived in Mexico could do it. On September 27, 1994, Shammam took Bihouet to Mexico. Shammam talked to the jeweler and had the gold melted down. On the way back home that day, Shammam made Bihouet pawn the gold at a San Ysidro pawn shop because he did not want the pawn slip in his name. She received $1,128 for the gold and handed all of the money to Shammam.

Bihouet also testified at trial that when she was riding in Shammam's truck with Shammam and Wessels days or weeks before the murder, Shammam and Wessels were joking around and talking about killing Binno. Rowe testified that Bihouet told him Shammam explained to her the reasons he and Wessels killed Binno, stating they killed

10

him "just for the fuck of it," Binno talked too much or was a "shit talker," and Binno owed money to Wessels.

Bihouet testified that she did not tell anyone sooner of Shammam's statements about Binno's murder because she was afraid of him and Wessels. Shammam had threatened her and her family regarding talking about the murder. Bihouet testified about an incident that occurred before Binno's murder. After she told Shammam she wanted to break up with him, he took her for a ride in Chula Vista to the end of a street where there was nothing. He told her to roll down her window, which she did, and then he pointed a gun toward the passenger window and shot it twice in front of her face. He then asked her what she needed to talk about. She remained silent.

Bihouet testified that after talking to Rowe, Shammam's father suggested that she leave the country and go to Mexico. She took a flight out of Mexico to Cancun with a ticket bought by Shammam. She lived with her father there for about a year and then returned in 1997 or 1998. She testified she left the country because she felt threatened.

In 1998, sheriff's detective Christopher Serritella was assigned responsibility for investigating the case. He initially intended to interview Bihouet but was not able to locate her. After running computer checks on her name, he eventually was able to locate her and, on April 19, 2000, interviewed her. The interview was recorded. Bihouet told Serritella that a day or two before the murder, she was a passenger in Shammam's truck with Shammam and Wessels. When Shammam drove past Binno's apartment complex, he told Wessels that was where Binno lived. Wessels then stated: "We should just kill the motherfucker." Bihouet also told Serritella that on the day of the murder, Shammam

11

and Wessels came to her home in the middle of the afternoon when it was bright and sunny, but she did not know the actual time. Shammam gave her some jewelry and told her to hide it for him. Bihouet believed Shammam and Wessels murdered Binno because there was "some bad blood" between Wessels and Binno. She also told him that after the murder Shammam and Wessels threw the gun in the ocean and disposed of their clothes. She told Serritella that after Shammam and his father learned she had spoken to Rowe, Shammam picked her up and took her to his father's home where they encouraged her in a friendly way to leave the country. Although she did not want to admit she was scared, she was. Serritella was involved in investigating the case until 2005 when he was promoted and transferred.

In his defense, Shammam presented evidence suggesting Binno may have been alive after 4:30 p.m. James Bassett, formerly known as James Smith (Smith), testified that on September 16, 1994, he lived in Binno's apartment complex and was interviewed by detectives late in the evening that day regarding a death at the complex. Smith did not recall knowing Binno or Brenda. Although Smith had no specific recollection of what he told the detectives, he testified he told them the truth. Genaro Moreno testified that on September 17, 1994, he was a homicide detective and interviewed Smith just after midnight that day. He prepared a report of his interview. Smith told him that about 7:15 to 7:30 p.m., he heard an unknown male voice say: "Hey, listen, I want to talk to you right now." Smith then heard an unknown female voice scream, "No," in an angry manner. Smith indicated that he thought the unknown male voice was that of the male who drove the black Volkswagen Rabbit and frequently slapped his girlfriend.

12

Vivian Shabilla testified that on September 16, 1994, she was supposed to receive delivery of a cell phone she purchased from Binno.[5]  At 4:58 p.m., her new pager showed Binno had paged her.  A few days later, she called Brenda because Binno had not returned her calls.  Brenda told her that Binno had been killed about 3:00 p.m. on September 16.  Shabilla told her that was impossible because she received a page from Binno at 4:58 p.m.  She asked Brenda to take her pager to the police, but nobody came and got it.  However, Brenda testified that Shabilla asked her help in how to read the information on her pager and, in particular, how to read the time Binno had called her.  Shabilla told Brenda the pager showed a telephone number and a time, but she did not state whether there was a date indicated on it.  Furthermore, Binno had called Shabilla many times the day before his murder to arrange either to deliver the cell phone or have her pick it up.

DISCUSSION

I

*Pre-accusation Delay*

Shammam contends the trial court erred by denying his motion to dismiss the case because he was denied his constitutional rights to due process because of the 14-year pre-accusation delay.

---

[5]     Shabilla's daughter, Melody, married Shammam's brother, Bradley, in 2003, but Shabilla did not know Shammam or his family in 1994.

# A

*Evidentiary hearing.* In support of his pretrial motion to dismiss based on pre-accusation delay, Shammam presented the testimony of various witnesses at a preliminary evidentiary hearing to show he suffered prejudice from the 14-year pre-accusation delay. Binno's sister, Tanya, testified she had many conversations with Rowe after Binno's death. Although she may have mentioned to him various persons who might have killed Binno, she could not remember any of those conversations with Rowe. She did not recall any discussion about Sal Asker. She did not recall any conversations with Rowe about possible drug dealing by Binno and Shammam. Although she knew a woman named Ophelia and a man named Billy Hernandez, she did not recall discussing them with Rowe. Tanya testified Rowe spent a lot of time investigating the case and "was doing his job above and beyond and maybe doing extra work on his own time."

Based on her conversations with Brenda, Bihouet, and Rowe, Tanya recalled that Shammam and his father had threatened Bihouet after they learned she gave a statement to Rowe. She recalled she heard that Shammam and his father went to Bihouet's house, knocked down the door, put a gun to their heads, and told them they better not testify or say anything. After that incident, Bihouet and her mother went to Mexico. Tanya recalled Rowe later telling her Bihouet had recanted or said she made it up.

Bihouet testified that Shammam and Wessels came to her apartment. Shammam told her they had killed Binno and handed her a bag. When she looked inside, she saw Binno's gold with his last name on it. A few days later, Shammam told her the details of Binno's murder, which she described in substantially the same manner as she did at trial.

14

Two years later, Bihouet told Brenda those details and then Tanya, who told her to talk to Rowe. Bihouet then gave a statement to Rowe. She did not recall giving another statement a few days later to a group of four or five men. She denied telling Rowe she made up the story that Shammam told her he had killed Binno. She remembered giving a statement to Serritella in 2000. Bihouet testified she continued to have an on-and-off relationship with Shammam for a few years after the murder. Shammam told her that if she or her family said anything, he would kill them. Bihouet testified that Shammam walked into her mother's house without knocking and pushed her mother. Weeks later, Bihouet left for Mexico. Shammam's father asked Bihouet if she knew anybody that lived far away. When she told him her father lived in Cancun, Shammam's father stated: "Why don't you go stay with your dad for a while until things get cleared up?" Shammam paid for her airline ticket to Cancun. She lived in Cancun for about a year.

Richard Martin testified that in 1996 he was an investigator for the district attorney. Although his name appeared in Rowe's notes bearing the date October 10, 1996, Martin could not recall meeting Rowe, or the Binno case. He thought it was possible Rowe's note referred to a planned meeting with certain people, which never occurred.

Dan Jopes testified that in 1996 he was a sheriff's detective. Jopes also had no recollection of an October 10, 1996, meeting. He stated it was his custom to record interviews with main witnesses.

Rowe testified that he was the sheriff's lead investigator in the Binno case from 1994 through 1997. He stated his memory of the case was not as good now as it was

15

back then. Tanya and the other Binno family members proposed to him various people who might have been involved in Binno's murder, including a woman named Ophelia and Diane Binno's ex-husband, Hernandez. He did not remember Sal Asker being named as a possible suspect, but he believed Asker was in custody at the time of Binno's murder.

In 1996 Bihouet came to the sheriff's department and Rowe conducted a recorded interview with her. She told Rowe that Shammam was involved in Binno's murder, came to her home, and handed her some gold. She told him she went to Mexico to melt down the gold. His team obtained Bihouet's receipt for a bar of gold from a San Ysidro pawn shop. Rowe did not recall any conversation with Bihouet in which she said, in effect, she made up her story that Shammam told her he killed Binno. Likewise, he did not recall telling Tanya or other Binno family members that Bihouet told him she made up the story. Rowe stated he would have remembered, or at least documented on paper, any such significant conversation.

Rowe did not remember an October 10, 1996, meeting with Davis, Martin, and Jopes. However, based on his notes bearing the date October 10, 1996, Rowe stated it appeared that the meeting occurred. He believed his notes referred to a meeting in which they discussed Bihouet's statements and their strategies in the case. Rowe testified he did not arrest Shammam in October 1996 because he was still trying to obtain more information about the incident and get more confirmation on some of the witnesses. In discussing the case with his supervisors, they believed there was insufficient corroboration and correct information to make an arrest. They never formally presented the case to the district attorney's office for a decision on whether there should be an

16

arrest. Rowe stated that in 1996 Mr. Pfingst (then acting as Shammam's trial counsel in 2010) was the San Diego County District Attorney. Rowe stated that it was his procedure to always record every interview of a main witness. Deputy District Attorney Gordan Davis testified that he had no recollection of, and no records showing, any meeting regarding the case on October 10, 1996.

Based on the evidence presented by Shammam, the trial court found Shammam suffered prejudice as a result of the pre-accusation delay. However, it stated "the delay has, in essence, prejudiced both sides with regard to presentation of the case." In considering the justification for the delay as set forth in the prosecution's papers opposing the motion to dismiss, the court asked Shammam's counsel:

> "Isn't the bottom line, with all that is said and done, whether or not the Abdala interview pre-2008 is such that it would lend credence to the People's position that they didn't have enough to go forward up until that point in time; and once they got that information, they felt they had a sufficiently strong case to present proof beyond a reasonable doubt to the panel? Isn't that what we are talking about?"

Shammam's counsel disagreed and argued the prosecution should be required to present testimony and other evidence to justify the pre-accusation delay. The prosecution agreed that if the court found prejudice from the delay, then it must present evidence showing justification for the delay.

As the evidentiary hearing proceeded, the prosecution presented two days of testimony to justify the pre-accusation delay. Rowe testified that in following up on leads after Binno's murder, Shammam and Wessels were developed as suspects. He interviewed Wessels and another team member interviewed Shammam. Both statements

17

were recorded. His team analyzed fingerprints found at the scene and checked for DNA presence. During the two and one-half years Rowe led the investigation, his team continued to develop more evidence through the crime lab and witness statements. During that period, he contacted Davis to informally discuss the case. On August 27, 1996, Rowe conducted a recorded interview of Bihouet. After that interview, they continued to develop more witnesses and obtain more physical evidence. He also was hoping DNA techniques would become more of a benefit as those techniques changed. Rowe tried contacting Bihouet after her August 27, 1996, interview, but he could not contact her and heard she had moved to Cancun, Mexico. On his promotion in May 1997, Rowe transferred the case to another detective (i.e., Serritella).

Serritella testified that he was assigned the case in 1998. He reviewed the case file and discussed the case with Rowe and his sergeant, Steve Wood. He tried to find Bihouet and finally located her in 2000. He looked for other evidence and witnesses that could bolster her credibility. He and Deputy District Attorney Glenn McAlister discussed the case but Serritella and others agreed it was not strong enough to issue an arrest warrant. When he was promoted in 2005, Serritella gave the case to Detective Curt Goldberg. Serritella testified he did not purposely delay the case to gain a tactical advantage over the defense.

Goldberg testified he was assigned the case in 2005. He spoke with Binno's family and followed up on any new leads. He contacted a crime reconstruction expert to determine whether he could bolster Bihouet's testimony. He interviewed old and new witnesses. He requested that DNA testing be conducted on hair found in Binno's

18

bathroom, but it was determined to be unsuitable for testing. He did not send the case to the district attorney's office because he could not find anything to corroborate Bihouet's statements. In 2007, the case was transferred to Detective Rick Scully. Goldberg denied he delayed the case to gain a tactical advantage over the defense.

Scully testified he worked on the case with Goldberg in 2005 and became its lead investigator in 2007. He reviewed all the evidence, interviewed many of the witnesses, and had blood evidence reevaluated. He was particularly interested in Abdala and went to his home several times to try to talk to him. Abdala initially would not talk to him. However, after Scully told him Shammam said he was with him (Abdala) the night of the murder, Abdala stated it was not true. Scully reviewed statements given by Shammam and Wessels, and concluded they differed regarding when, and the number of times, they went to Binno's apartment. After speaking with Abdala twice and reevaluating the blood evidence, Scully believed there was sufficient evidence to present the case to the district attorney's office. In July 2008, he presented the case to a roundtable of several deputy district attorneys and members of the sheriff's department. In September 2008, an arrest warrant was issued for Shammam.

Deputy District Attorney Brock Arstill, the prosecuting attorney, testified he participated in the July 2008 roundtable discussion. At that time, he believed the case was thin, but viable. The witnesses were still alive, Bihouet's potential bias had diminished, and her credibility had been enhanced because she no longer faced liability as an accessory after the fact. Importantly, Abdala provided information corroborating

19

Bihouet's statement. Arstill saw no indication the sheriff's department was delaying the case to gain an advantage over the defense.

*Trial court's ruling.* On May 27, 2010, the trial court issued a written order denying Shammam's pretrial motion to dismiss for pre-accusation delay. The court stated:

> "In the present case, the defense has made a showing that [Shammam] suffered some prejudice due to the delay in filing the felony complaint. Sufficient evidence has been presented to establish that memories of both civilian and law enforcement witnesses have faded due to the lapse of time. The Court finds this to be the sole basis of prejudice, specifically rejecting [Shammam's] claim that the delay prohibited the investigation of potential third-party liability. The Court further rejects [Shammam's] claim that an unrecorded or un-noted interview of a major prosecution witness contained exculpatory evidence, specifically finding that insufficient evidence has been presented to establish that the interview ever took place.

> "As [Shammam] has shown that memories have faded, the People must establish that the prosecution had a legitimate justification for the delay in this case. The People contend the delay was justified based on investigative purposes. [¶] . . . [¶]

> "The investigation in this case was ongoing between the commission of the crime in 1994 and the eventual filing of a criminal complaint in 2008. Certainly greater investigative activity took place during some periods than others, but there is no evidence to suggest that either the investigating agency or the District Attorney's office terminated or otherwise 'shelved' the criminal investigation. As revealed in the series of evidentiary hearings conducted in conjunction with this motion, the investigation of the Binno murder was handed off to a series of detectives between 1996 and 2008. In turn, each detective re-examined the case, in some instances re-interviewed witnesses and family members, and met with representatives of the District Attorney's office to discuss the case and other avenues of investigation. This continuing investigation serves as an adequate justification for delay. The Court finds no evidence to support the conclusion that the delay in filing criminal

20

charges was motivated by a desire to gain some tactical advantage over [Shammam] nor was the delay the result of any negligence on the part of either the Sheriff's Department or the District Attorney. This is not to say that a more intense investigation could not have been done, nor does the Court conclude that all persons of interest were thoroughly investigated. However, any failure to interview or pursue all leads was insufficient to support a conclusion that the delay in question was unjustified.

"After considering the evidence presented by the People at the motion hearing, this Court finds the initial decision to delay prosecution was made after a good faith evaluation of the evidence by the detectives and prosecutors reviewing the case, followed by a subsequent good faith re-evaluation of the evidence prior to the filing of criminal charges in 2008. The People had discretion to delay filing the case in order to ensure law enforcement had conducted a complete investigation. The fact that no new substantive evidence was discovered by the investigating agency or the prosecution during the delay, other than the David Abdala statement on April 20, 2008, does not illustrate that there was no justification for the delay. The People's good faith decision to not prosecute this case constitutes justification for the delay. [¶] Even though the People's justification may only constitute minimal justification, it still overcomes [Shammam's] showing of prejudice in this case. . . .

"In balancing the prejudice [Shammam] demonstrated at the motion hearing against the People's justification for the delay in filing the murder charge, this Court finds that [Shammam's] due process rights have not been violated. The purpose of the delay was not to gain a tactical advantage over [Shammam]. The delay was the result of the prosecution exercising its discretion to delay filing of the charges for investigative purposes. In this Court's opinion, the actual prejudice suffered by [Shammam] as a result of the delay is slight to moderate prejudice. When weighing that prejudice against the People's justification for the delay and then taking into consideration the seriousness of the crime and the public's interest in favor of this type of prosecution, the Court finds that no due process violation has been shown."

*Subsequent motions to dismiss.* After the mistrial was declared in the first trial, Shammam filed another motion to dismiss the case for pre-accusation delay. Considering

21

the evidence presented at the first trial together with the evidence presented at the pretrial evidentiary hearing on the first motion, the trial court denied the motion. After the second trial in which the jury found Shammam guilty of first degree murder and found true the firearm allegation, Shammam filed another motion to dismiss the case for pre-accusation delay. The trial court denied the motion. After presiding over the pretrial evidentiary hearing on the first motion and the two jury trials, the court concluded there was nothing that would change the position it took in denying the two prior motions to dismiss. It stated:

> "Clearly, the investigation in this particular case was flawed. Clearly, there was a problem with witnesses recalling things that took place. Clearly, there was evidence of [suggestibility] to a witness that was presented, and it was fully exposed both in the first trial and in the second trial. That, in and of itself, does not convince the court that Mr. Shammam has met his burden to show that he did not receive fair trials in either the first or second trial. The court's position is to the contrary, that he did."

The court denied Shammam's third motion to dismiss for pre-accusation delay.

B

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging." (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*); see also *People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*); *U.S. v. Lovasco* (1977) 431 U.S. 783, 789-792.) "A defendant's state and federal constitutional speedy trial rights [citations] do not attach before the defendant is

22

arrested or a charging document has been filed." (*People v. Abel* (2012) 53 Cal.4th 891, 908.) "A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. [Citations.] A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant." (*People v. Catlin* (2001) 26 Cal.4th 81, 107.)

The defendant has the initial burden of showing prejudice before the prosecution is required to offer a reason for the delay. (*People v. Morris* (1988) 46 Cal.3d 1, 37.) Prejudice may be shown by loss of material witnesses or evidence or by the dimming of memories because of the lapse of time. (*Cowan*, *supra*, 50 Cal.4th at p. 430; *People v. Martinez* (2000) 22 Cal.4th 750, 767; *People v. Catlin*, *supra*, 26 Cal.4th at p. 107.) Because prejudice is not presumed, a defendant must affirmatively show prejudice by means of competent evidence rather than "speculation, surmise or conjecture." (*Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 947; *Nelson*, *supra*, 43 Cal.4th at p. 1250.) A claim of faded memory is speculative unless the defendant makes an affirmative showing of actual prejudice suffered because of that faded memory. (*People v. Abel*, *supra*, 53 Cal.4th at p. 908.)

"[T]he law under the California Constitution is at least as favorable for defendant[s]" as federal law regarding pre-accusation delays. (*Nelson*, *supra*, 43 Cal.4th at p. 1251.) "Under the California standard, 'negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process.

23

This does not mean, however, that whether the delay was purposeful or negligent is irrelevant.' [Citation.] Rather, 'whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales toward[] finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] The justification for the delay is strong when there is 'investigative delay, nothing else.' " (*Cowan*, *supra*, 50 Cal.4th at p. 431.) "A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Nelson*, at p. 1256.)

"The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. . . . Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . . Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt." (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 914-915.)

On appeal, "[w]e review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual

24

findings if substantial evidence supports them [citation]." (*Cowan*, *supra*, 50 Cal.4th at p. 431; see also *People v. Morris*, *supra*, 46 Cal.3d at p. 38.) Unless the evidence is undisputed and there are no credibility determinations, "[t]he question of whether pre-accusation delay is unreasonable and prejudicial is a question of fact" to be determined by the trial court and therefore a court does not abuse its discretion if its determination is supported by substantial evidence. (*People v. Boysen* (2007) 165 Cal.App.4th 761, 777; see also *People v. Mitchell* (1972) 8 Cal.3d 164, 167; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1330; *People v. Dunn-Gonzalez*, *supra*, 47 Cal.App.4th at pp. 911-912.)

C

Shammam asserts the trial court erred by denying his motions to dismiss the case for pre-accusation delay. He argues the court erred by concluding the prejudice he suffered from the delay was outweighed by the prosecution's justification for the delay.

*Prejudice from delay*. We conclude there is substantial evidence to support the trial court's finding that Shammam suffered some prejudice from the 14-year pre-accusation delay. The court expressly found he suffered prejudice solely in the form of faded memories of civilian and law enforcement witnesses. We need not discuss each and every instance in which a witness, either during the pretrial hearing on the first motion or during the first or second trial, testified that he or she could not recall specific events or times of events. As Shammam notes, the record is replete with testimony of witnesses showing their faded memories of events in 1994 and thereafter. However, Shammam cites little, if any, evidence showing that he was actually prejudiced by the

25

faded memories. He asserts the memories of certain witnesses (e.g., Bihouet and Abdala) became more biased and distorted against him over time, but provides only innuendo, and no proof, of bias and distortion. Absent such proof, that assertion is argumentative and speculative and does not provide a basis for finding he suffered actual prejudice. (*Nelson*, *supra*, 43 Cal.4th at p. 1250; *People v. Abel*, *supra*, 53 Cal.4th at p. 908.) We likewise reject, as argumentative and speculative, Shammam's argument that the 14-year delay allowed prosecution witnesses (e.g., Bihouet and Tanya) time to change their stories and "invent" new facts.

Shammam also argues the pre-accusation delay prevented him from corroborating his September 17, 1994, statement to police and refuting the "half truths" argument made by the prosecution. However, he did not present any affirmative evidence showing what corroborating evidence would have been discovered had the pre-accusation delay not occurred. Shammam's apparent claim that Abdala would have provided corroborative or otherwise supportive testimony had he (Abdala) been interviewed by law enforcement officers shortly after the murder is, again, argumentative and speculative and does not constitute a showing of actual prejudice. Shammam argues investigators could have checked out Abdala's assertion that he (Shammam) called or paged him while he (Abdala) was attending the football game had they interviewed him shortly after the murder. Absent such timely investigation, Shammam argues he was unable to refute Abdala's trial testimony and support his own statement that he went to the football game with Abdala. Likewise, his assertion that their failure to investigate the veracity of his September 17, 1994, statement (e.g., by confirming whether or not he ate breakfast at the

26

restaurant and got his truck repaired at the dealership) deprived him of evidence potentially favorable to the defense, is also argumentative and speculative, and does not show actual prejudice. To the extent he likewise asserts that other omissions in the investigation of Binno's murder deprived him of potentially favorable defense evidence, that assertion is argumentative and speculative and does not show he suffered actual prejudice.

Shammam also apparently asserts he was prejudiced by the delay because he could not impeach Bihouet's testimony as effectively as he could have had the case been prosecuted in 1996. He argues that in 1996 Bihouet could have been prosecuted, and given immunity, for being an accessory after the fact to the murder, receiving stolen property, or other crimes. Had he been prosecuted in 1996, Shammam could have used the immunity grant to impeach Bihouet's testimony implicating him in Binno's murder by showing she had a motive to testify favorably to the prosecution. He argues that because of the prolonged delay in prosecuting him, Bihouet was not, at the time of his 2010 trial, subject to criminal liability for those crimes because the applicable statutes of limitation had run. As a result, Bihouet did not need to demand, and did not receive, immunity for those crimes, thereby depriving Shammam of one means of impeaching her testimony. However, the trial court did not find the lack of impeachment evidence constituted prejudice to Shammam resulting from the pre-accusation delay. As discussed above, the court found the sole basis of prejudice caused by the delay was the fading memories of civilian and law enforcement witnesses. Based on our review of the record, we conclude

27

there is substantial evidence to support the court's implied finding that the absence of impeachment evidence did not cause actual prejudice to Shammam.

Shammam also argues the delay in prosecution prejudiced him because he could not impeach Bihouet's testimony with evidence that in 1996 she recanted her statement to police. He argues Rowe's notes support an inference that Bihouet made new and inconsistent statements on or about October 10, 1996, after her initial August 27, 1996, recorded statement implicating him (Shammam) in Binno's murder. At Shammam's 2010 trial, Rowe could not recall any inconsistent statements or second interview in 1996. Shammam argues that had the case been prosecuted in 1996, he could have questioned Rowe regarding his notes and, based on his more recent memory, potentially obtained evidence that Bihouet did, in fact, recant, or otherwise make statements inconsistent with, her August 27, 1996, recorded statement. That evidence could have been used to impeach Bihouet's trial testimony. However, Shammam's argument is, again, speculative and does not show actual prejudice. Furthermore, the trial court expressly found no second 1996 statement was made by Bihouet. In denying Shammam's motion to dismiss, the court stated: "The Court further rejects [Shammam's] claim that an unrecorded or un-noted interview of a major prosecution witness contained exculpatory evidence, specifically finding that insufficient evidence has been presented to establish that the interview ever took place." Based on our review of the record, we conclude there is substantial evidence to support the trial court's finding that no second interview with Bihouet occurred in 1996. Shammam has not carried his burden on appeal to show otherwise.

28

Shammam also apparently argues he was prejudiced by the delay because a more timely and complete investigation of Binno's murder and of all leads regarding involvement of third parties may have produced exculpatory evidence. However, Shammam's argument is speculative and does not show actual prejudice. Furthermore, the trial court implicitly found no prejudice resulted from any inadequacies in the investigation of third party leads. On the contrary, the court found the only prejudice Shammam suffered from the delay was due to the fading memories of witnesses. As we stated above, there is substantial evidence to support that finding and Shammam has not carried his burden on appeal to show otherwise. To the extent he cites *People v. Archerd* (1970) 3 Cal.3d 615, 640 (abrogated on another ground in *Nelson, supra,* 43 Cal.4th at pp. 1254-1255) as setting forth certain factors a court must weigh in determining prejudice, we presume the trial court was aware of, and considered, those factors in finding Shammam was prejudiced by the faded memories of witnesses. It is not our function on appeal to reweigh those factors and make an independent determination of prejudice if the trial court's finding is supported by substantial evidence.

*Justification for the delay.* Shammam asserts the trial court erred by concluding the pre-accusation delay was justified by the continuing investigation of Binno's murder. In support of his argument, he presents in great detail omissions or other deficiencies in the investigation of Binno's murder showing that investigation was negligently conducted, and possibly intentionally delayed. For purposes of our opinion, we need not discuss the details of each purported deficiency. Rather, we briefly describe those purported deficiencies to provide context for our disposition. Shammam argues Rowe

29

and the other members of the sheriff's investigative team did not check the veracity of his (Shammam's) September 17, 1994, statement to police. He argues they did not investigate who made the calls from Binno's cell phone on or about September 24, 1994. He argues investigators did not ask the pathologist to determine the time of Binno's death. He argues they did not check the veracity of Smith's and Shabilla's statements. He argues they failed to adequately investigate leads regarding potential third party commission of, or involvement in, Binno's murder (e.g., investigation of Sal Asker, Ophelia, an unnamed Mexican male, and the unidentified woman who left a message on Binno's answering machine). He argues no significant investigative activity occurred after 1996 while the case was transferred from detective to detective.

Assuming arguendo all of those purported investigative deficiencies exist, we nevertheless conclude there is substantial evidence to support the trial court's findings that the investigation was not negligent and the pre-accusation delay was justified by the continuing investigation of Binno's murder. In denying Shammam's first motion to dismiss, the court stated:

> "*This continuing investigation serves as an adequate justification for delay*. The Court finds *no evidence* to support the conclusion that the delay in filing criminal charges was motivated by a desire to gain some tactical advantage over [Shammam] nor was *the delay the result of any negligence* on the part of either the Sheriff's Department or the District Attorney. This is not to say that a more intense investigation could not have been done, nor does the Court conclude that all persons of interest were thoroughly investigated. However, *any failure to interview or pursue all leads was insufficient to support a conclusion that the delay in question was unjustified*." (Italics added.)

30

The court further found that "[t]he People's good faith decision to not prosecute this case [until 2008] constitutes justification for the delay."

The trial court in this case was in a unique position to judge the credibility of the witnesses and weigh the extensive testimony and other evidence presented during the pretrial evidentiary hearing on Shammam's first motion to dismiss, and during the two jury trials that led his conviction. Based on our review of the "cold" record on appeal, we cannot conclude there is insufficient evidence to support the trial court's finding that the pre-accusation delay was justified by the continuing investigation of Binno's murder. Shammam has not carried his burden on appeal to show there is insufficient evidence to support the court's finding and that the investigation was, instead, negligently conducted, intentionally delayed, or otherwise unjustifiably delayed. To the extent he cites evidence and inferences favorable to him, he misconstrues and/or misapplies the substantial evidence standard of review we apply in reviewing the trial court's factual finding that the pre-accusation delay was justified by the continuing investigation of Binno's murder and good faith decision not to prosecute the case until 2008. (*Cowan*, *supra*, 50 Cal.4th at p. 431; *People v. Morris*, *supra*, 46 Cal.3d at p. 38; *People v. Boysen*, *supra*, 165 Cal.App.4th at p. 777; *People v. Mitchell*, *supra*, 8 Cal.3d at p. 167; *People v. Mirenda*, *supra*, 174 Cal.App.4th at p. 1330; *People v. Dunn-Gonzalez*, *supra*, 47 Cal.App.4th at pp. 911-912.) Shammam's assertion that the investigation of Binno's murder was flawed or should have been more promptly and thoroughly conducted does not show there is insufficient evidence to support the trial court's finding that the investigation was not negligent. The court could reasonably infer from the evidence that the investigation was

31

not negligent. It is not our function on appeal to reweigh that evidence or make inferences other than those reasonably made by the trial court. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) Furthermore, "[t]he justification for the delay is *strong* when there is 'investigative delay, nothing else.' " (*Cowan, supra*, 50 Cal.4th at p. 431, italics added.) "A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Nelson, supra*, 43 Cal.4th at p. 1256.)

To the extent Shammam argues the trial court's rulings denying his motions to dismiss included language that may be inconsistent with its finding that the investigation was not negligent and the pre-accusation delay was justified, we conclude he again misconstrues and/or misapplies the standard of review. In reviewing the trial court's rulings, we make all intendments and presumptions, including reasonable inferences, to support that ruling. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) In so doing, we conclude any inconsistent or ambiguous language in the court's rulings should be construed as not conflicting with its finding that the pre-accusation delay was justified by the continuing investigation and good faith decision not to charge Shammam until 2008. He notes that in denying his third motion to dismiss the case, the court stated: "Clearly, the investigation in this particular case was flawed." However, the court implicitly found that flawed investigation did not provide a basis on which to change the findings it made in denying his first two motions (e.g., the investigation was not negligent and the pre-accusation delay was justified by the continuing investigation). We conclude Shammam has not carried his burden on appeal to show the evidence is insufficient to support the

trial court's finding that the pre-accusation delay was justified by the continuing, nonnegligent investigation.

D

Shammam also asserts the trial court erred by improperly balancing the prejudice from the delay against the justification for the delay and by considering an improper factor (i.e., seriousness of the crime). He first notes the trial court described the prejudice he suffered from the delay as "slight to moderate." He also asserts the court described the justification for the delay as "minimal." He apparently then argues the court erred by finding the minimal justification outweighed the slight-to-moderate prejudice and therefore his due process rights were not denied. However, although the court described Shammam's prejudice as slight to moderate, it did not find the justification was, in fact, "minimal." Rather, that adjective appears in the court's finding: "*Even though* the People's justification *may* only constitute *minimal* justification, it still overcomes [Shammam's] showing of prejudice in this case." (Italics added.) Our interpretation of this statement is that the trial court balanced the justification for the delay against the prejudice from the delay and found the prejudice was so insignificant that even a minimal justification for the delay would have been sufficient to outweigh that prejudice and support its finding that Shammam's due process rights were not denied by the delay. Furthermore, we doubt the trial court, in fact, considered the delay for continuing investigation to be "minimal." As we noted above, the justification for delay is "strong" when it is investigative delay and nothing else, as the trial court found in this case. (*Cowan*, *supra*, 50 Cal.4th at p. 431.) Based on our interpretation of the court's order, we

33

do not conclude the court abused its discretion or otherwise erred by finding the justification for the delay outweighed the prejudice from the delay.

Shammam also argues the trial court abused its discretion by considering an improper factor in balancing the prejudice against the justification for the delay. In denying his motion to dismiss, the court stated:

> "*In balancing the prejudice* [Shammam] demonstrated at the motion hearing *against the People's justification for the delay* in filing the murder charge, *this Court finds* that [Shammam's] *due process rights have not been violated*. The purpose of the delay was not to gain a tactical advantage over [Shammam]. The delay was the result of the prosecution exercising its discretion to delay filing of the charges for investigative purposes. In this Court's opinion, the actual prejudice suffered by [Shammam] as a result of the delay is slight to moderate prejudice. *When weighing that prejudice against the People's justification for the delay and then taking into consideration the seriousness of the crime and the public's interest in favor of this type of prosecution, the Court finds that no due process violation has been shown*." (Italics added.)

Shammam argues the court abused its discretion by citing *Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 954, and including the "seriousness of the crime" as a factor in its balancing process. However, reading the trial court's findings as a whole and making all intendments and inferences to support its ruling, we conclude the court applied the proper due process test by balancing the prejudice from the delay against the justification for the delay. The court stated: "*In balancing the prejudice* [Shammam] demonstrated at the motion hearing *against the People's justification for the delay* in filing the murder charge, *this Court finds* that [Shammam's] *due process rights have not been violated*." Although the court subsequently stated it also considered the seriousness of the crime, we construe that statement as mere surplusage to its basic finding that

34

Shammam's rights to due process were not denied because the justification for the delay outweighed the prejudice. Alternatively stated, we construe the court's subsequent reference to the "seriousness of the crime" as noting it considered that factor as additional support for its main finding that the justification outweighed the prejudice and not, as Shammam argues, together with those two factors in performing the due process balancing test. We conclude the trial court did not abuse its discretion in weighing the proper factors and determining Shammam's rights to due process were not denied by the 14-year pre-accusation delay. Assuming arguendo the trial court performed a second balancing test and erred by including the seriousness of the crime as a factor, we nevertheless would conclude such error was harmless beyond a reasonable doubt in the circumstances of this case.

II

*CALCRIM No. 362*

Shammam contends the trial court erred by instructing with CALCRIM No. 362 on consciousness of guilt.

Over Shammam's objection, the trial court instructed with CALCRIM No. 362 as follows:

> "If the defendant made a false or misleading statement relating to the charged crime, knowing that the statement was false or intending to mislead, that comment may show that he was aware of his guilt and you may consider [it] in determining [his] guilt.
>
> "If you conclude that the defendant made such a statement, [it is] up [to] you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

35

An instruction with CALCRIM No. 362 (or former CALJIC No. 2.03) on a defendant's consciousness of guilt is warranted when there is substantial evidence to support it. (See, e.g., *People v. Turner* (1994) 8 Cal.4th 137, 202 [former CALJIC No. 2.03]; *People v. Kelly* (1992) 1 Cal.4th 495, 531 [same].) "It is well established that pretrial false statements by a defendant may be admitted to support an inference of consciousness of guilt by the defendant." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1102.) In *People v. Louis* (1984) 159 Cal.App.3d 156, 160, the court stated: "[T]he giving of [former] CALJIC No. 2.03 is justified when there is evidence that a defendant fabricated a story to explain his conduct." Alternatively stated, an instruction on consciousness of guilt "is justified when there exists evidence that the defendant prefabricated a story to explain his conduct." (*Edwards*, at p. 1103.) However, that instruction "should never be given unless it can be inferred that the defendant made the false statement for the purpose of deflecting suspicion from himself, as opposed to protecting someone else." (*People v. Rankin* (1992) 9 Cal.App.4th 430, 436.)

Based on our review of the record, we conclude there is substantial evidence to support an instruction with CALCRIM No. 362 on consciousness of guilt. In Shammam's September 17, 1994, statement to police, he stated he attended the Valhalla football game with Bihouet and Abdala the evening of September 16. He also stated he first learned of Binno's death when Binno's brother, Joe, called him that night while he was sleeping. At trial, Brenda testified that, at a detective's request, she called Shammam in the early morning hours of September 17, 1994. Shammam told her that he could not

come there right away because he was coming home from Disneyland. Also at trial, Abdala testified Shammam did not attend the Valhalla football game with him, but rather called and picked him up in the parking lot during the game. Shammam then told him Wessels had killed Binno.

Based on that evidence, the jury could reasonably infer Shammam knowingly made false statements to deflect suspicion from himself. The jury could infer Shammam knowingly made a false statement to detectives that he first learned of Binno's death from Joe, Binno's brother, when other evidence supports a finding he learned of Binno's death when he personally saw Binno shot twice in the head. The jury could also infer Shammam knowingly made a false statement to Brenda when he told her he was on his way back from Disneyland, when other evidence supports a finding he had not gone to Disneyland but, in fact, was in town while he murdered Binno and then went home that night. The jury could also infer Shammam knowingly made a false statement to police that he attended the Valhalla football game with Abdala, when other evidence supports a finding he did not attend that game and instead only picked up Abdala in the stadium parking lot. Based on the substantial evidence supporting an inference that Shammam knowingly fabricated a story and made false statements to deflect suspicion from himself, the trial court did not err by instructing with CALCRIM No. 362 on consciousness of guilt. (*People v. Edwards*, *supra*, 8 Cal.App.4th at pp. 1102-1103; *People v. Louis*, *supra*, 159 Cal.App.3d at p. 160; *People v. Rankin*, *supra*, 9 Cal.App.4th at p. 436.)

37

## III

*Alternative Remedies for Unconstitutional Pre-accusation Delay*

Shammam contends the trial court erred by not granting him an alternative remedy to dismissal of the case for the 14-year pre-accusation delay that denied him his constitutional rights to due process.  However, because we concluded above that the trial court did not err by concluding the 14-year pre-accusation delay did not deny Shammam his rights to due process, no remedy, whether dismissal of the case or some lesser remedy (e.g., exclusion of testimony of certain prosecution witnesses), was warranted.  The trial court did not err by not granting Shammam an alternative remedy to dismissal of the case against him.

## DISPOSITION

The judgment is affirmed.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.